**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE PRESS COALITION'S MOTION FOR ACCESS TO VIDEO EXHIBITS AND TO SET ASIDE STANDING ORDER NO. 21-28 | Case No.<br><br>Oral Argument Requested |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR
ACCESS TO VIDEO EXHIBITS AND TO SET ASIDE STANDING ORDER NO. 21-28**

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Lauren Russell (#1697195)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
russelll@ballarspahr.com

*Counsel for the Press Coalition*

## PRELIMINARY STATEMENT

No American can reasonably dispute the recent observation of the Court of Appeals for the District of Columbia Circuit: "[T]he violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The public's interest in the administration of justice has never been greater than it is with the criminal cases arising out of this dangerous threat to the peaceful transfer of authority. To reinforce the public's confidence in the stability of our government, the courts must ensure maximum public transparency for the unprecedented prosecutions in the Capitol Cases.

In this motion, Cable News Network, Inc., American Broadcasting Companies, Inc. d/b/a ABC News, The Associated Press, Buzzfeed, Inc. d/b/a BuzzFeed News, CBS Broadcasting Inc. o/b/o CBS News, Dow Jones & Company, Inc., publisher of The Wall Street Journal, The E.W. Scripps Company, Gannett Co., Inc., Gray Media Group, Inc., Los Angeles Times Communications LLC, publisher of The Los Angeles Times, National Public Radio, Inc., NBCUniversal Media, LLC d/b/a NBC News, The New York Times Company, Pro Publica, Inc., Tegna, Inc., and WP Company LLC, d/b/a The Washington Post (together, the "Press Coalition") seek to advance the public interest by obtaining videos that Defendant Grady Owens and the Government submitted to this Court in Case No. 21-cr-286-BAH-1 as evidence regarding whether Defendant should be released from custody pending trial. These videos (the "Video Exhibits") are judicial records to which the public has a right of access under both the First Amendment and common law. The Court should release them, without restriction, immediately.

Moreover, to fully vindicate the public's right of access, the Court also should set aside Standing Order No. 21-28 (BAH) (May 14, 2021) (the "Standing Order"), which unduly restricts transparency in this proceeding. While intended to facilitate access to the Video Exhibits, the Standing Order actually limits access here in three ways: (1) by default, it contravenes the

longstanding presumption of openness by permitting the Government to delay disclosure for three days after any order to release videos; (2) it provides access to Video Exhibits only to "credentialed" members of the press, and not the public; and (3) it presumptively restricts republication of lawfully-obtained Video Exhibits without a finding that such a restriction furthers a state interest of the highest order.

The need for contemporaneous, comprehensive access to the record of these prosecutions is even clearer now, as bipartisan efforts to establish an independent commission to investigate the Capitol riot have stalled in Congress.  *See* Ryan Nobles et al., *Senate Republicans block January 6 commission*, CNN (May 28, 2021), https://www.cnn.com/2021/05/28/politics/january-6-commission-vote-senate/index.html.  With the Legislative Branch deadlocked, and the Executive Branch already responsible for prosecuting the Capitol Cases, the Judicial Branch alone can offer the public an objective inquiry into the events of January 6.  This Court should therefore ensure that these proceedings are as transparent as the Constitution and the common law require.  The Court should make the Video Exhibits available to the public immediately and without restrictions on their republication.

## BACKGROUND

I.     **The Riot At The United States Capitol**

On January 6, 2021, thousands of rioters operating under "the guise of First Amendment-protected activity" stormed the United States Capitol in a "blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."  *See Director Wray's Statement on Violent Activity at the U.S. Capitol Building*, FBI (Jan. 7, 2021), https://www.fbi.gov/news/pressrel/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.  In response, federal law enforcement agencies "deployed [their] full investigative resources . . . to aggressively pursue those involved in criminal activity."

*Id.*  The Department of Justice has since charged more than 400 individuals, including the

Defendant in this case, with crimes committed during the Capitol riot.  *See, e.g.*, *Capitol Breach*

*Cases*, Dep't of Justice, https://www.justice.gov/usao-dc/capitol-breach-cases.

According to the Department of Justice, "[t]he investigation and prosecution of the

Capitol Attack will likely be one of the largest in American history, both in terms of the number

of defendants prosecuted and the nature and volume of the evidence."  Mot. to Continue and

Exclude Time at 1, *U.S. v. Caldwell*, No. 21-cr-28 (D.D.C. Mar. 12, 2021), Dkt. 73.  Among that

evidence is "more than 15,000 hours of surveillance and body-worn camera footage from

multiple law enforcement agencies," *id.* at 2, including the Video Exhibits at issue in this motion.

## II.    This Case

On March 30, 2021, Owens was charged with multiple offenses for allegedly breaking

into the Capitol and assaulting a Metropolitan Police Department ("MPD") officer.  *See* Crim.

Compl., Dkt. 1.  Specifically, Defendant is alleged to have struck an officer over the head with a

skateboard.  Crim. Compl., Statement of Facts at 7, Dkt. 1-1.  After Defendant's arrest in Florida,

the presiding Magistrate Judge ordered that he be detained pending trial.  *See* Order of Detention

Pending Trial, Case No. 6:21-mj-1286-DCI (M.D. Fla., Apr. 2, 2021), Dkt. 13.  In ordering

Defendant's detention, the Magistrate Judge found the "weight of the evidence appears to be

strong based on the criminal complaint affidavit . . . as well as the Government's proffer" that,

among other things, there was video evidence of Defendant assaulting the MPD officer.  Hr'g Tr.

23:12-23, Dkt. 14-1.  The case was then transferred to this Court.

On April 23, 2021, Defendant moved to revoke the detention order.  Def's Mot. for

Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b), Dkt. 13.  The Defendant argued

there was a "lack of clearly incriminating evidence against [him]," *id.* at 1, 7, and that videos

showed the officer initiated contact with him by "grabbing him from behind with a gloved hand,"

leading Defendant to swing his skateboard "instinctively" in self-defense, *see* Supp. to Def.'s Mot. for Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b), at 2-3, Dkt. 23.

The parties presented their arguments and video clips of the events at a May 10, 2021 hearing, and the Court stated that it would consider supplemental briefing before issuing an order.  *See* Minute Entry of May 10, 2021.  In supplemental briefing, the Government represented that newly uncovered surveillance footage depicted Defendant attempting a second assault on an MPD officer with his skateboard while attempting to break into the Capitol building.  *See* Gov't Suppl. Br. Related to Def.'s Mot. Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b) ("Gov't Suppl. Br.") at 4, Dkt. 20.  In response, the Defendant submitted a written report by that MPD officer denying that he had been hit with the skateboard.  Def.'s Suppl., Ex. A (FBI 302 Interview of MPD Officer H.S.) at 1-2, Dkt. 23-1.

On May 28, 2021, the Court granted Defendant's request for release, concluding that "though defendant's conduct in hitting an MPD officer with his skateboard, combined with his other conduct on January 6, 2021 at the Capitol, was dangerous then, the future risk he poses to the safety of others and the community can be contained with stringent conditions of release." Mem. Op. at 25-26, Dkt. 26.

## III.   The Video Exhibits

In connection with Defendant's motion to revoke the detention order, the parties submitted four Video Exhibits to the Court and showed clips of the Video Exhibits at the May 10 detention hearing.  *See* Gov't Notice of Filing of Exhibits Pursuant to Local Crim. R. 49, Dkt. 24.  The Government represented that body-worn camera footage "corroborates the assault relayed by Officer C.B. and shows precisely how the defendant assaulted him."  Gov't Resp. to Def.'s Mot. for Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b) at 10, Dkt. 14. The Defendant, however, asserted that Video Exhibits showed the Government had made

"material mistakes in their original detention hearing proffer."  Supp. to Def.'s Mot. for

Revocation of Detention Order Pursuant to 18 U.S.C. § 3145(b), at 4, Dkt. 23.  The parties also

disagreed whether Capitol surveillance footage supported the Government's allegations that

Defendant attempted a second assault on an MPD officer while trying to break into the Capitol

building.  *See* Gov't Suppl. Br. at 4, Dkt. 20.

After viewing the video, the Court found that body-worn camera footage depicted Owens

"[swinging] the skateboard forcefully down toward" the first MPD officer's head, but that there

was no sound of impact.  Mem. Op. at 5.  As to the second alleged assault, the Court

acknowledged that the officer said he was not hit with the skateboard, but Owens' swinging of

the skateboard nevertheless had "chilling echoes of the incident with MPD Officer C.B. that had

occurred shortly before."  *Id.* at 18.

In its decision granting Defendant's request for pretrial release, the Court stated that the

Video Exhibits "show defendant, initially, on the Capitol grounds, where he skirmished

physically with MPD officers, hit one MPD officer with his skateboard, and joined the angry

crowd in yelling at, and making obscene gestures towards, the MPD officers.  Then, less than

two hours later, defendant is captured on video pushing with a crowd of other rioters to gain

entry to the Capitol building, despite a blockade of USCP and MPD officers valiantly trying to

keep the mob out."  Mem. Op. at 18-19.  The Court determined that although Defendant could be

seen assaulting an MPD officer, he "did so without apparent planning or coordinated actions or

conventional dangerous weapons and in the midst of a riled up, angry mob."  *Id.* at 23.  After

weighing the relevant factors, the Court granted Defendant's request for release to home

detention, with GPS location monitoring.  *See* Order Setting Conditions of Release, Dkt. 29.

## IV.    The Standing Order

As this Court is aware, this is not the Press Coalition's first effort to increase public

access to the Capitol Cases.  On March 24, 2021, the Press Coalition moved for access to videos

that had been shown in open court and submitted as exhibits in support of detaining defendant

George Tanios before trial.  *See* Mot. for Access, *In re Application for Access to Certain Sealed*

*Video Exhibits*, No. 21-mc-34-TFH (D.D.C. Mar. 24, 2021) (seeking access to videos in *U.S. v.*

*Tanios*, No. 21-cr-222-TFH-2).  The Government initially opposed releasing those videos, only

to agree to produce them shortly before a hearing was set to be held on the access motion.  *See,*

*e.g.*, Katelyn Polantz, *Justice Department releases video of attack on Capitol Police officer*,

CNN (Apr. 28, 2021), https://www.cnn.com/2021/04/28/politics/brian-sicknick-capitol-riot-

videos/index.html.  Videos first shown in open court on March 22 were finally released on April

28, more than a month after the prosecution, defense counsel and the court viewed them in a

public court proceeding.  In finally releasing these videos, the Government did not seek, and the

court did not impose, any restrictions on the news media in sharing those videos with the public.

Subsequently, in an attempt to expedite disclosures of these court records moving

forward, the Press Coalition wrote to this Court to request entry of a Standing Order directing the

Government to proactively release all unsealed video exhibits in the Capitol Cases to a

representative member of the press.  The press then would have been responsible for distributing

the videos to other news organizations and making them accessible to the public.  *See* Mot. to

Access Video Exhibits, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*,

No. 21-mc-46-BAH (D.D.C. May 3, 2021).  This Court largely rejected that request.  Instead, the

Standing Order permits the Government to unilaterally edit videos before releasing them, permits

access only to a "member of the media with necessary access credentials provided by the

government," and expressly prohibits any copying or redistribution:

> Members of the media seeking access to video exhibits submitted
> to the Court in Capitol Cases may file an application, pursuant to
> [Local Criminal Rule 57.6], to the presiding judge in the case, or if
> no judge has been assigned, to the Chief Judge, for determination,
> and the judge may seek the position of the parties.  Upon grant of
> such media application, the government shall make the video
> exhibit available to any member of the media with necessary
> access credentials provided by the government, unless the order
> otherwise limits access.  Members of the media provided access to
> video exhibits in a particular case pursuant to such order may view
> those exhibits using the "drop box" technical solution proposed by
> the [United States Attorney's Office for the District of Columbia].
> No recording, copying, downloading, retransmitting, or further
> broadcasting of video exhibits in a particular case is permitted,
> unless such permission is granted by the presiding judge, who may
> seek the position of the parties.

Standing Order at 5-6. [1]

## ARGUMENT

Strict application of the First Amendment and the common law are essential in all of the

Capitol Cases.  The Court should adhere to these protections and order the immediate release of

the Video Exhibits in this case.  Moreover, the Standing Order does not conform to the well-

established First Amendment and common law requirements for contemporaneous access to, and

the unrestricted right to redistribute, court records.  The Press Coalition therefore also asks this

Court to set aside the Standing Order.

**I.    The Court Should Release The Video Exhibits Immediately**

The Court should immediately release the Video Exhibits for two independently

sufficient reasons.  For one, because the First Amendment right of access applies to the Video

Exhibits, they should be released because neither the Government nor the Defendant could

possibly show that continued secrecy "is essential to preserve higher values and is narrowly

---

[1] The Standing Order is available at https://www.dcd.uscourts.gov/sites/dcd/files/SO%2021-28_Pandemic_Media%20Access%20to%20Video%20Exs%20in%20Pretrial%20Capitol%20Cases_20210514.pdf.  For this Court's convenience, a copy is attached as Exhibit A to this motion.

tailored to serve that interest." *Dhiab v. Trump*, 852 F.3d 1087, 1102 (D.C. Cir. 2017)

(Williams, J., concurring).  For another, the common law access right also applies to the Video

Exhibits, and "[a]lthough [this] right is not absolute, there is a strong presumption in its favor,"

which cannot be rebutted on the facts of this case.  *See Metlife, Inc. v. Fin. Stability Oversight*

*Council*, 865 F.3d 661, 663 (D.C. Cir. 2017); *United States v. Jackson,* 2021 U.S. Dist. LEXIS

49841, at *13-24 (D.D.C. Mar. 17, 2021) (granting access to video exhibits under common law).

## A.      The Court Should Release The Video Exhibits Under The First Amendment

"The Supreme Court has sketched a two-stage process for resolving whether the First

Amendment affords the public access to a particular judicial record or proceeding."  *Dhiab v.*

*Trump*, 852 F.3d 1087, 1102 (D.C. Cir. 2017) (Williams, J., concurring).  "First the court must

determine whether a qualified First Amendment right of public access exists.  If so, then . . . the

record or proceeding may be closed only if closure is essential to preserve higher values and is

narrowly tailored to serve that interest."  *Id.* (internal marks and citations omitted).  Here, the

right of access clearly attaches to the Video Exhibits, and neither the Defendant nor the

Government could possibly carry the weighty burden to overcome that right and justify

withholding them from the public.

### 1.      The First Amendment access right attaches to the Video Exhibits

Courts follow the "experience and logic" test to determine the constitutional right of

access to records or a proceeding.  *Press-Enter. Co. v. Super. Ct.* ("*Press-Enterprise II*"), 478

U.S. 1, 9 (1986).  Under this test, the right of access attaches if "the place and process have

historically been open to the press and general public" and if access "plays a significant positive

role in the function of the particular process."  *Id.* at 8.  Applying this test here, the constitutional

right of access plainly attaches to the Video Exhibits.

It is already well settled that "[t]he First Amendment guarantees a qualified right of public access to criminal proceedings" and related judicial records.  *In re Application of WP Co.*, 201 F. Supp. 3d 109, 117 (D.D.C. 2016) (citing *Globe Newspaper Co. v. Super. Ct.*, 457 U.S. 596, 603-04 (1982)).  Moreover, this access right clearly applies to pretrial proceedings as well. *See Press-Enterprise II*, 478 U.S. at 12-13 (holding that First Amendment right of access applies to preliminary hearing in criminal case and observing that "the absence of a jury, long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge, makes the importance of public access to a preliminary hearing *even more* significant") (emphasis added and citation and internal marks omitted).[2]

These Video Exhibits were entered as exhibits by the parties in support of their arguments regarding whether Defendant should be released from detention prior to trial.  They therefore satisfy the experience and logic test and fall under the First Amendment right of access.

## 2.    The First Amendment access right cannot be overcome on this record

Because this constitutional right of access applies to the Video Exhibits, the Court should release them unless keeping them from the public "is essential to preserve higher values and is narrowly tailored to serve that interest."  *Dhiab*, 852 F.3d at 1102 (Williams, J., concurring). Specifically, to overcome the constitutional access right, the party seeking closure must demonstrate that:

> 1.  There is a substantial probability of prejudice to a compelling interest if the right is not limited.  *Press-Enterprise II*, 478 U.S. at 13-14.

---

[2] *See also In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984) ("The same policy concerns that the Supreme Court identified when it found that the public has a First Amendment right of access to criminal trials . . . operate in pretrial proceedings.  The decision to release on bail an accused who subsequently flees the jurisdiction may effectively end the trial before it has begun; the decision to hold an accused without bail deprives of his liberty a citizen who has not yet been convicted of a crime.  In either case, the bail decision is one of major importance to the administration of justice, and openness will help to assure the public that the decision is properly reached.").

2. There is no alternative to a limitation of the access right that will adequately protect against the threatened harm. *Press-Enterprise II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d 282, 289-90 (D.C. Cir. 1991).

3. Restricting access will effectively protect against the threatened harm. *Press-Enterprise II*, 478 U.S. at 14; *Robinson*, 935 F.2d at 291-92.

4. The restriction on access is narrowly tailored to minimize the harm to the public's access rights. *Press-Enterprise II*, 478 U.S. at 13-14; *Robinson*, 935 F.2d at 287.

Nothing on the record suggests that keeping the Video Exhibits from the public is essential to preserve higher values. Moreover, even if the Government or the Defendant could assert a potential risk of harm, and they cannot, they additionally would need to demonstrate that alternative measures cannot adequately redress that risk. *Id.* at 290; *cf. In re NBC*, 653 F.2d 609, 613-17 (D.C. Cir. 1981) (applying this requirement to common law access test). At no point in any of the Capitol Cases has the prosecution or defense attempted to make that showing.

Because the First Amendment right of access applies to the Video Exhibits, and there are no findings on the public record demonstrating that continuing to withhold them is essential to preserving any higher values, the Court should grant access to the Video Exhibits immediately.

**B.     The Court Should Release The Video Exhibits Under The Common Law**

The Video Exhibits also should be released pursuant to the common law right of access. "Although [this] right is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests." *Metlife*, 865 F.3d at 663. Like the constitutional right of access, courts apply the common law right of access in a two-stage analysis. First, courts determine whether the records at issue are "judicial records" to which there is a "strong presumption" in favor of access. *Id.* at 665-67. Once a court makes the determination that an exhibit or filing is a "judicial record," it applies the six-factor test set out in *United States v.*

*Hubbard* to determine whether the party seeking closure has rebutted the "strong presumption" of public access.  650 F.2d 293, 317-21 (D.C. Cir. 1980).

For precisely the same reasons articulated in the *Jackson* case, the Video Exhibits are judicial records to which the public has a presumptive right of access under the common law. *See Jackson*, 2021 U.S. Dist. LEXIS 49841, at *13-14 & n.3 (stating that "[d]ocuments and other materials filed in court intended to influence the court are judicial records" and clarifying that whether Video Exhibits were "filed on the public docket has no bearing on whether they are judicial records, since they are not in a format amenable to filing on the Court's Case Management/Electronic Filing (CM/ECF) system").  Neither the Defendant nor the Government can possibly rebut the resulting presumption of access under the *Hubbard* test.  *See Jackson,* 2021 U.S. Dist. LEXIS 49841, at *13-24.

Moreover, as the D.C. Circuit has recognized, there is a particular "need for public access in those instances where the documents at issue are specifically referred to in the trial judge's public decision.'"  *EEOC v. Nat'l Children's Ctr.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (internal marks omitted) (quoting *Hubbard*, 650 F.2d at 318).  Here, the Court referred to video footage throughout the decision to grant Defendant's request for conditional release prior to trial.  *See* Mem. Op., Dkt. 26.  This Court therefore should grant public access to the Video Exhibits in this case pursuant to the common law as well.

## II.     The Court Should Set Aside The Standing Order

In releasing the Video Exhibits in this case, the Court also should set aside the Standing Order, as it does not provide the public with access to the Video Exhibits consistent with the First Amendment and common law.  The Standing Order provides that the Court should (1) give the Government no less than 3 days to place the videos on an electronic "drop box"; (2) allow the

Government to make the videos accessible only to "credentialed" members of the press; and (3) presumptively prohibit the press from recording, copying, downloading, transmitting, or otherwise publishing the videos to the public.  *See* Standing Order at 5-6.  Each of these provisions violates the First Amendment right of access.  This Court therefore should exercise its authority and set it aside in this case.  *See, e.g.*, *United States v. Ray*, 375 F.3d 980, 995 (9th Cir. 2004) (assessing constitutionality of challenged standing order); *United States v. Zingsheim*, 384 F.3d 867, 870 (7th Cir. 2004) (describing standing order as "problematic" and holding that the court can "address the legal status of the order in the course of assessing its application" in a particular case).

> ### A.     The Standing Order Fails To Provide Contemporaneous Access

The Standing Order first fails by ignoring the principle that the right of access to court records and proceedings is a right of <u>contemporaneous</u> public access.  The Standing Order contemplates that the Government's "drop box" system will not make these Video Exhibits available to the public until "at least 72 hours" after the Court has ordered their release "in light of the possible need for redactions (e.g., personal identifiable information) and uploading of voluminous numbers of exhibits."  *See* Standing Order at 3.  But because the Video Exhibits are subject to the First Amendment and common law right of access, delayed release by default is simply not lawful.  "[T]he presumption of access normally involves a right of *contemporaneous* access."  *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1310 (7th Cir. 1984) (emphasis added); *see also Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) ("a necessary corollary of the right to access is a right to timely access"); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 126 (2d Cir. 2006) ("Our public access cases and those in other circuits emphasize the importance of *immediate* access where a right to access is found.") (emphasis added).  The Court should

.                                              12

therefore set the Standing Order aside and order the Government to release the Video Exhibits immediately.[3]

### B.      The Standing Order Fails To Provide Access To The General Public

The Standing Order also falls short of the First Amendment by relying on a system for releasing videos – the Government's electronic "drop box" – that fails to provide access to the general public.  In proposing the "drop box" system, the Government admitted it may be able to provide access to "the general public" if requests become "too voluminous."  *See* Gov't Resp. to Court's May 5, 2021 Order, 4 n.2, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*, No. 21-mc-46-BAH (D.D.C. May 6, 2021), Dkt. 5.  Rather than require the Government to put forward a better system that provides access to the press and public on equal terms, or accept the Press Coalition's offer to assist,[4] however, this Court provided for narrowly restricting access and leaving the technical issues to the prosecution.  It ordered the Government to "make the video exhibit available to *any member of the media with necessary access credentials provided by the government*."  Standing Order at 6 (emphasis added).

Providing access to the "credentialed" press but not to the general public violates the First Amendment.  As the Second Circuit explained in *Huminski v. Corsones*, which concerned the

---

[3] The Standing Order's failure to provide prompt access is even more apparent now that the Press Coalition has actually submitted applications pursuant to the Standing Order.  The Clerk's Office has informed undersigned counsel that it will handle each access application as a separate miscellaneous action and that it will not open such an action until it receives a filing fee, which it accepts only via check or money order.  In practice, therefore, the process of applying itself holds up access to video exhibits by multiple days on top of the 72-hour delay addressed above.

[4] The Press Coalition specifically offered that ProPublica, an independent, nonprofit news organization, could "serve as the press representative and take on the responsibility of receiving video exhibits from the Government, coordinating distribution of the videos to other press organizations, and making the videos accessible to the general public."  *See* Mot. to Access Video Exhibits at 8, *In re Press & Public Access to Video Exhibits in the Capitol Riot Cases*, No. 21-mc-46-BAH (D.D.C. May 3, 2021).

exclusion of a member of the general public from Vermont state courthouses, "the exclusion of any person undermines right-of-access principles in much the same way, if not to the same extent, as a blanket denial of access does: You cannot foster an appearance of fairness, thereby boosting community trust in the administration of justice, unless *any member of the public* – not only members of the public selected by the courts themselves – may come and bear witness to what happens beyond the courtroom door."  396 F.3d 53, 83-84 (2d Cir. 2004) (emphasis added); *see also Co. Doe v. Pub. Citizen*, 749 F.3d 246, 263 (4th Cir. 2014) ("[T]he right of access is widely shared among the press and the general public alike, such that anyone who seeks and is denied access to judicial records sustains an injury.").

As the First Amendment and common law guarantee access to the Video Exhibits, this Court should not permit the Government to exclude the general public.  For this reason as well, the First Amendment and common law require the Court to set aside the Standing Order.

C.     **The Standing Order Presumptively Bars Constitutionally Protected Speech**

Finally, the Standing Order violates the First Amendment by its default provision enjoining the press from recording, copying, downloading, transmitting, or otherwise publishing the videos to the public.  *See* Standing Order at 6.[5]  In a series of cases over the past 50 years, the Supreme Court has strongly established that when the press "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order."  *Fla. Star v. B.J.F.*, 491 U.S. 524, 533 (1989).  As the Court summarized those cases:

---

[5] This provision also conflicts with the common law, which provides "'a general right to inspect *and copy* public records and documents, including judicial records and documents.'"  *Leopold v. United States*, 964 F.3d 1121, 1127 (D.C. Cir. 2020) (Garland, J.) (emphasis added) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).

> In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), we
> found unconstitutional a civil damages award entered against a
> television station for broadcasting the name of a rape-murder
> victim which the station had obtained from courthouse records.  In
> *Oklahoma Publishing Co. v. Oklahoma County District Court*, 430
> U.S. 308 (1977), we found unconstitutional a state court's pretrial
> order enjoining the media from publishing the name or photograph
> of an 11-year-old boy in connection with a juvenile proceeding
> involving that child which reporters had attended.  Finally, in
> *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979), we found
> unconstitutional the indictment of two newspapers for violating a
> state statute forbidding newspapers to publish, without written
> approval of the juvenile court, the name of any youth charged as a
> juvenile offender.  The papers had learned about a shooting by
> monitoring a police band radio frequency and had obtained the
> name of the alleged juvenile assailant from witnesses, the police,
> and a local prosecutor.

*Id.* at 530-31.  Here, too, an order permitting journalists to view video exhibits, but forbidding

them from rebroadcasting the videos, violates the First Amendment.  The ban on redistributing

Video Exhibits of paramount public concern does not advance any cognizable interest, let alone

a state interest of the highest order.

To the contrary, the Government's interest here lies <u>in favor</u> of allowing the press to

rebroadcast the Video Exhibits.  As the Supreme Court recognized in its seminal access ruling,

the press often "function[s] as surrogates for the public" in providing access to judicial

proceedings, and "public understanding of the rule of law" necessarily depends on ensuring that

the press can "report what [they] have seen and heard."  *Richmond Newspapers v. Virginia*, 448

U.S. 555, 572-73 (1980).  Indeed, "[t]o work effectively, it is important that society's criminal

process satisfy the appearance of justice, and *the appearance of justice can best be provided by

allowing people to observe it*."  *Id.* at 571-72 (emphasis added).  In granting access to the Video

Exhibits, or any court record for that matter, the presumption <u>favors</u> republication of those

records for the public good.

Once journalists have access to video released by the Government, a judicial prohibition against including them in news reports would act as a direct prior restraint on the press.  *See, e.g.*, *United States v. Smith*, 123 F.3d 140, 155 n.17 (3d Cir. 1997) ("Under prior restraint law, orders prohibiting the media from publishing information already in its possession are strongly disfavored.").  In this respect as well, the Standing Order exceeds the courts' authority under the First Amendment.  As with punishing publication after the fact, the Constitution does not permit a prior restraint absent a state interest of the highest order.  *See Smith*, 443 U.S. at 102 (noting that a prior restraint "requires the highest form of state interest to sustain its validity" and that "[p]rior restraints have been accorded the most exacting scrutiny").  No such interest exists here.

In establishing a presumption against publication, the Standing Order flips the First Amendment on its head.  For this reason as well, the Court should set aside the Standing Order and enter its own order granting access to the Video Exhibits in this case.

## CONCLUSION

For the foregoing reasons, the Press Coalition respectfully requests that the Court set aside the Standing Order and order the immediate and full release the Video Exhibits.

Dated:  June 7, 2021             Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Lauren Russell (#1697195)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
russelll@ballarspahr.com

*Counsel for the Press Coalition*

.                                    16